418 So.2d 538 (1982)
STATE of Louisiana
v.
Lawrence Wayne HUNTLEY.
No. 81-KA-3139.
Supreme Court of Louisiana.
June 21, 1982.
Rehearing Denied September 3, 1982.
*539 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Jack D. Miller, Michael Garsen, Asst. Dist. Attys., for plaintiff-appellee.
Jack Rogers, John M. Crochet, Rogers, St. Romain & Crochet, Lake Charles, for defendant-appellant.
FRED C. SEXTON, Jr., Justice Ad Hoc [*].
On February 28, 1980, defendant, Lawrence Wayne Huntley, was indicted by the Grand Jury of Vermillion Parish for first degree murder. The defendant was arrested the same day pursuant to an arrest warrant arising from the Grand Jury indictment. The defendant was charged with the April 9, 1976, stabbing death of Linda Hebert, which occurred during the armed robbery of a liquor store owned by the deceased and her husband. At the time of the robbery, the deceased was alone in the store. The day after his arrest, February 29, 1980, the defense confessed to the murder of Mrs. Hebert, giving both oral and written admissions of guilt.
On January 6, 1981, the state amended the indictment to charge the defendant with second degree murder. After a trial by a jury of twelve, the defendant was found guilty of second degree murder as charged. On February 17, 1981, the defendant was sentenced to life imprisonment, at hard labor, without benefit of parole, probation, or suspension of sentence for a period of forty (40) years. The defendant appeals his conviction and argues two assignments of error.
ASSIGNMENT OF ERROR NO. 1
Defendant's first assignment of error charges that the trial court erred in denying defendant's motion to suppress post-indictment confessions given to police officers shortly after his arrest and before he had counsel. The defendant contends that confessions given by him were elicited unconstitutionally by state agents in violation of his right to the presence of counsel at all critical stages of a criminal proceeding as secured by the Sixth and Fourteenth Amendments to the United States Constitution.
He asserts that Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and its progeny, Brewer v. Williams, 403 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424, as well as the recent case of United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), preclude interrogation after indictment in the absence of counsel, unless the state proves convincingly that the defendant affirmatively waived counsel's presence.
*540 In Massiah, a 1964 decision, the United States Supreme Court held improper the placing of a transmitter on a cooperating co-defendant, whose cooperation was unknown to the defendant. The purpose of the transmitter, of course, was to enable government agents to overhear statements elicited from the defendant by the cooperating co-defendant. This action was post-indictment and the defendant was on bond.
Henry is similar to Massiah. After indictment the government agents contacted an informant who had previously worked with them and who was also in the same jail. The defendant subsequently made incriminating statements to this paid informant which were introduced at his trial. The differences between Henry and Massiah are that in Henry the informant and the defendant did not have a long standing relationship and further, in Henry, the informant was specifically instructed not to initiate any conversations about the alleged conduct of the defendant in question.
Brewer is the well known "christian burial speech" case rendered by a sharply divided court.[1] The defendant had consulted with an attorney in Des Moines, Iowa, prior to turning himself in to police in Davenport, Iowa. His attorney in Des Moines had told him not to talk to police officers. After his arrest and appearance before a judge in Davenport an attorney was appointed in those proceeding who likewise advised him not to talk with police officers. Additionally the Des Moines attorney specifically instructed the officers who were to travel to Davenport to return the defendant not to interrogate him. Likewise the Davenport attorney told the Des Moines officers when they arrived there that they were not to interrogate the defendant during the course of the return trip. He also advised the defendant not to make any statements to the officers.
Apparently the weather was quite cold and snow was expected. During the trip, after warning the defendant not to discuss the matter with him, one of the detectives told the defendant that he realized they would be going past the site where the defendant had left the child who was the victim of this offense and asked the defendant to consider the fact if they did not stop and locate the body, that if they attempted to do so after going first to Des Moines, that the snow might preclude even the defendant from locating the body. He told the defendant not to tell him anything then but to "think about it." Brewer subsequently told the officer without further prompting where to locate the body. This statement and the resulting evidence were used against him at the trial.
There was no real dispute as to the facts between either the "majority," those concurring or the dissents. The divergence of opinion was on the interpretation to be given to those facts. The majority viewed the action of the detective as not being an interrogation, while the dissents saw the defendant's statement as a voluntary waiver. The concurrence of Justice Stevens caught the spirit of the opinion as he pointed out that an experienced trial attorney had trusted the officers not to interrogate the defendant. Thus the court felt that this trust had been dishonored by surreptitious police conduct.
On examination it is apparent the main concern of the court in all these cases was over what was viewed as surreptitious indirect action by law enforcement agents involving trick or artifice. That is, the police agency "deliberately elicited" the incriminating statements from the defendants after counsel had been brought into the case.
Note that in Massiah and Henry the government action complained of is substantially after indictment and the entry of counsel into the case. Massiah makes it clear that it was the surreptitious police conduct in obtaining evidence that concerned the court.
"... here the damaging testimony was elicited from the defendant without his *541 knowledge while he was free on bail." (Emphasis added).
The majority noted with approval language from a dissent in the Court of Appeal:
"If such a rule is to have any efficacy it must apply to indirect and surreptitious interrogation as well as those conducted at the jail house." (Emphasis added).
The court narrowed the holding by stating:
"All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." Massiah, supra, 84 S.Ct. at p. 1203. (First emphasis added).
By the time Massiah had matured into Henry it was clear that the United States Supreme Court considered the rule of Massiah to preclude government agents deliberately eliciting incriminating statements after counsel was or should have been in the case. The Chief Justice, as author, noted:
"The question here is whether under the facts of this case, a government agent `deliberately elicited' incriminating statements from Henry within the meaning of Massiah." Henry, supra, at p. 2186.
The Chief Justice went on to say:
"By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel the government violated Henry's Sixth Amendment right to counsel.... [This is a case] where the `constable' planned an impermissible interference with the right to the assistance of counsel." Henry, supra, at p. 2189. (Emphasis added).
Thus the debate among the court seemed to center on whether the facts and holding in Henry established a more passive test. Justice Blackmun complained in dissenting that the majority holding in Henry required henceforth:
"... a showing that the agent created a situation `likely to induce' the production of incriminating remarks." Henry, supra, at p. 2193. (Emphasis added).
So whether the test was actually changed by Henry to the more passive "likely to induce," the real concern in all three cases was over planned surreptitious conduct after the case had reached, or should have reached, an adversary level.
In articulating that subjective concern the United States Supreme Court spoke in objective terms of the action being a deprivation of the right to counsel in that the actions of the law enforcement officers "interrogated" the defendant after a critical stage of the proceedings (indictment) and that it was error to do so.[2]
The defendant in this case had only been arrested the day before and had not yet been brought before a magistrate. He was apparently under the influence of alcohol and thus the interrogation complained of was some 26 hours later, at least partly because of his condition at the time of arrest. If the state had obtained an arrest warrant for the defendant instead of an indictment, the defendant obviously could not then be heard to complain as to his statements on a Sixth Amendment basis. It is illogical under these circumstances to compare this case with Massiah, Brewer or Henry where the concern was over conduct intended to "deliberately elicit" or "induce" the defendant to incriminate himself. There is not the slightest allegation of surreptitious or indirect conduct here.
It is evident that this defendant convincingly waived his Sixth Amendment rights. He was rendered his Miranda warnings on at least four occasions. Importantly the record shows that the defendant initiated the conversation which led to his eventual statements in question with Officer Bernard. Bernard, apparently a jailer, saw the defendant, whom he knew, in the corner of his cell and asked him how he was *542 feeling. The defendant responded that his stomach was bothering him and he came and sat next to the officer and began talking about the offense to him. Bernard interrupted him and told him that he did not have to tell him anything about it.
The defendant stopped talking but later apparently without questioning by Bernard stated, "I've been wanting to tell for a long time." He did not actually relate the events and the officer told him that he did not have to tell him if he did not want to. The defendant reiterated his desire to discuss the matter. Bernard then asked the defendant if he wanted to confess without a lawyer. The defendant responded that he did not have money for a lawyer and Bernard told him that he did not need money to have a lawyer. At the defendant's request Bernard contacted the defendant's mother and sister so he could talk with them about it before talking to the investigating officers.
Bernard emphasized that he told the defendant that if he repeated his statements to one of the investigating officers that they would use it against him. Bernard testified that the defendant stated he did not care. Subsequent to giving an oral recorded confession the defendant also gave a written confession. The written confession was before a notary public unconnected with the police department. It was this notary's first occasion to render such a service to the Abbeville Police Department. In that notarized statement after each line of warning the notary asked the defendant if he understood the enumerated right. Specifically included therein was the following:
"I was, also, warned and advised of my rights to the advice and presence of my own lawyer. Before any time during any questioning of statements I make, or if I am not able to hire a lawyer, I may request and have a lawyer appointed for me by the proper authorities without cost or charge to me. I do not want to talk to a lawyer, and I hereby knowingly and purposely waive my rights to the advice and presence of a lawyer before and during questioning or at any time before or while I voluntarily make the following statements to the aforementioned or aforesaid person."
Thus the defendant initiated the conversation with an officer (who was not investigating the case) by indicating his desire to tell about the event. He was given the opportunity to talk to his mother and sister before the investigating officers inquired of him. He specifically waived his right to counsel in no uncertain terms before the police officers and later before an impartial notary public, after numerous Miranda warnings. His statements were not "deliberately induced" or even "enticed." Thus the agents for the state did not violate the defendant's Sixth Amendment right to counsel as articulated by Massiah, Brewer and Henry.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 2
The defendant's second and final contention is that the trial court erred in allowing a photograph of the victim's body to be admitted into evidence. The test of admissibility of a so called "gruesome" photograph is whether its probative value outweighs its possible inflammatory or prejudicial effect on the jury. State v. Myles, 389 So.2d 12 (La.1979), rehearing denied. As this court noted in State v. Manieri, 378 So.2d 931 (La.1980):
"Photographs of the body of a victim depicting fatal wounds are generally relevant to prove the corpus delicti, to corroborate other evidence of manner in which death occurred, to establish the location, severity and number of the wounds, and to establish the identity of the victim. State v. Cooper, 334 So.2d 211 (La.1976). However, the danger of abuse where photographs are exhibited to the jury warrants some qualification of this rule. The sight of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence. 4 Wigmore, Evidence, § 1157 (Chadbourn, rev. ed., 1972). State v. Gilmore, 332 So.2d 789 (La. 1976)."
*543 Here the photograph tends to corroborate the pathologist's testimony and although the photograph is unpleasant it is not of such a great inflammatory or prejudicial nature as to outweigh its probative value. We find that the trial court did not abuse its discretion in admitting the photograph of the victim's body. Accordingly we find the assignment of error without merit.
For the reasons assigned the defendant's conviction and sentence are affirmed.
AFFIRMED.
LEMMON, J., concurs.
DENNIS, J., dissents with reasons.
NOTES
[*] Judges Fred C. Sexton, Jr., and William Norris, III, of the Court of Appeal, Second Circuit, and Judge Robert L. Lobrano of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices pro tempore, joined by Associate Justices Pascal F. Calogero, Jr., James L. Dennis, Jack C. Watson, and Harry T. Lemmon.
[1] Justice Stewart wrote for the two man majority with Justice Marshall, Powell and Stevens concurring. Chief Justice Burger was joined in an extremely sharp dissent by Justice White, Black and Rhenquist. Note that the Chief Justice was the author of Henry.
[2] Note that Louisiana only requires an indictment in capital cases and life imprisonment cases, Art. 1, Section 15 of the Louisiana Constitution of 1974, LSA-C.Cr.P. Art. 382, but an indictment is required in all federal prosecutions unless waived by the defendant, U.S. Constitution, Amend. 5, Federal Rules of Criminal Procedure, Rule 7.