646 So.2d 1049 (1994)
STATE of Louisiana
v.
Larry KELSON.
No. 94-KA-263.
Court of Appeal of Louisiana, Fifth Circuit.
November 16, 1994.
John M. Crum, Jr., Dist. Atty., G. Charles Lorio, Jr. and Rodney Brignac, Asst. Dist. Attys., 40th Judicial Dist., Edgard, for plaintiff/appellee.
Patricia A.G. Dean and Dinah S. Cain, Metairie, for defendant/appellant.
Before GRISBAUM, WICKER and GOTHARD, JJ.
GOTHARD, Judge.
The St. John the Baptist Parish Grand Jury issued a bill of indictment on July 20, 1993, charging defendant, Larry Kelson, with the first degree murder of Varrone Carter, pursuant to LSA-R.S. 14:30. Defendant was arraigned on July 21, 1993, and pled not guilty.
On October 12, 1993, the St. John the Baptist Parish District Attorney amended the indictment, reducing the charge to second degree murder, pursuant to LSA-R.S. 14:30.1. Defendant was arraigned on the amended charge and pled not guilty.
A jury trial was held on October 12, 13 and 14, 1993. At the conclusion of trial, the jury returned a unanimous verdict of guilty as charged.
Defendant filed a motion for new trial on October 20, 1993, which was denied. On December 16, 1993, pursuant to LSA-R.S. 14:30.1.B, the trial court sentenced defendant to life in prison without benefit of parole, probation or suspension of sentence.

FACTS
State's witness Junius Banks testified at trial that he encountered his longtime friend, Varrone "Trinny" Carter, (hereinafter referred to as "the victim") at the Kart-n-Karry convenience store in Reserve, Louisiana, shortly after 10:00 p.m. on December 24, *1050 1992. The victim asked Banks to drive him to Lutcher, Louisiana, to find a cocaine supplier from whom the victim wished to buy crack cocaine. The two smoked marijuana cigarettes in Banks' car as they drove to Lutcher. When the victim was unable to locate the person he sought, he and Banks returned to Reserve.
Banks and the victim went to a house in Reserve where the victim purchased a quarter ounce of crack cocaine. The two then went to defendant Larry Kelson's house, where the victim cut up the crack and sold it to defendant and others who came to defendant's house that night. The victim left defendant's house at least once to sell crack to some of defendant's neighbors.
At about 1:00 a.m. on the morning of December 25, 1992, only Banks, the victim and defendant remained at defendant's house. Banks and the victim sat on sofas in the den smoking marijuana cigarettes and talking. Banks testified that at some point, defendant went to the back of the house and returned to the den holding a hammer. Defendant hit the victim on the head with the hammer and robbed him of the cash he had received from the crack sales that night. Defendant also took the remaining crack which the victim had in his possession. Defendant then dragged the victim from the sofa onto the floor and wrapped the victim's bleeding head with a blue towel. Fearing for his own safety, Banks fled the scene and drove home.
Defendant followed Banks to his home and asked for his help in disposing of the victim's body. Banks refused. Later that Christmas morning, defendant returned to Banks' house and gave him $100.00 to keep quiet about the murder.
At about 7:30 a.m. on December 25, 1992, St. Charles Parish sheriff's deputies discovered the victim's body alongside Louisiana Highway 628 in Montz, Louisiana. The victim had sustained lacerations about his face, neck and chest area and his ankles were bound together with nylon string.
Detective Sergeant Michael Tregre of the St. John the Baptist Parish Sheriff's Office testified at trial that on December 28 and 29, 1992, he took recorded statements of several individuals with regards to the case. In a statement given on December 28, 1992, Junius Banks said that he was with the victim on the night of December 24, 1992, but did not reveal that he had actually witnessed the murder.
Detective Tregre obtained a search warrant for defendant's house on December 29, 1992. The warrant was executed the same day. Items seized in the search included a roll of nylon string, four blood scrapings and a glass crack cocaine pipe.
Special Agent Chester Blythe of the Federal Bureau of Investigation, who qualified at trial as an expert in the field of hair and fiber analysis, testified that the string found tied around the victim's ankles and the string seized from defendant's house were made of the same materials. There were not sufficient unique characteristics in the ends of the string to make a physical fit, so Agent Blythe turned the string over to F.B.I. Special Agent Richard Buechele in the Materials Analysis Unit.
Special Agent Buechele, who was qualified at trial as an expert in the field of material analysis, testified that he also tested the composition of both the string found tied around the victim's ankles and the string seized from the defendant's house and determined that both strings were composed of the same type of nylon. Additionally, there were stained or soiled areas on both strings. Upon comparison, Agent Buechele determined that there was a regular, random pattern of soiled marks on both the string from the victim and the string from the defendant's house. The identical, corresponding marks on both strings were so unique that Agent Buechele believed that the string from the victim had to have originated from the roll which was seized from the defendant's house.
On June 4, 1993, Junius Banks was arrested and charged with being a principal to first degree murder, pursuant to LSA-R.S. 14:24 and 14:30. On that date, Detective Tregre took a second recorded statement from Banks in which Banks admitted to having witnessed the murder. Banks described the murder weapon as a carpenter's claw hammer with a white or yellowish handle.
*1051 Based on this revised statement, Detective Tregre obtained a second search warrant for defendant's house. The warrant was executed on June 15, 1993, during which the officers seized a carpenter's claw hammer from defendant's kitchen table. Technician Harry Trosclair of the St. John the Baptist Parish Sheriff's Department's crime lab testified at trial that he sent the hammer to the Louisiana State Police crime lab for testing. Tests for fingerprints and blood came back negative.
At trial, the hammer was introduced as State's Exhibit 20. Detective Tregre identified it as the hammer that was seized from defendant's house. Dr. Fraser Mackenzie, a pathologist with the Jefferson Parish Coroner's office who performed the autopsy on the victim, testified that the fatal wounds (a large fracture on the left side of the victim's head and a puncture wound just beneath the right eye that entered the brain) could have been caused by the hammer. Further, Junius Banks identified the hammer as the one defendant used to attack and kill the victim.
The defense objected to the admission of the hammer into evidence. After argument out of the jury's presence, the trial court overruled counsel's objection and allowed the hammer to be admitted.

ADMISSIBILITY OF EVIDENCE
In his sole assignment of error, defendant argues that the trial court erred when it allowed inflammatory evidence unrelated to the crime to be introduced as evidence against appellant notwithstanding objection by the defense counsel. Defendant asserts that the hammer admitted into evidence at trial did not fit the description given by eyewitness Junius Banks during his June 4, 1993 statement to police. Defendant contends, therefore, that the admission of the hammer constitutes prejudicial error.
With some exceptions, all relevant evidence is admissible at trial. LSA-C.E. art. 402. "Relevant evidence" is that which tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." LSA-C.E. art. 401. Fruits and physical evidence of a crime as well as weapons used to commit a crime are relevant to show the commission of such crime and are therefore generally admissible at trial. State v. Foster, 267 So.2d 188 (La.1972). Relevant evidence may be excluded at trial "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." LSA-C.E. art. 403.
Before it can be admitted at trial, demonstrative evidence must be properly identified. Accordingly, it must be established that it is more probable than not that the object is one connected with the crime. The identification may be visual, that is, testimony that the object introduced is one connected with the case. The identification can also be accomplished through chain of custody, by tracing the object from the time it was seized to the time it was offered into evidence. State v. Sweeney, 443 So.2d 522 (La. 1983); State v. Landry, 388 So.2d 699 (La. 1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); State v. Alexander, 621 So.2d 861 (La.App. 5th Cir.1993), writ granted and remanded for resentencing, 629 So.2d 376 (La.1993).
In the matter before us, the State laid the proper foundation before the trial court allowed State's Exhibit 20, the carpenter's claw hammer, to be admitted into evidence. Chain of custody was established through the testimony of Detective Sergeant Michael Tregre, who seized the hammer while executing the second search warrant at defendant's house, and by Technician Harry Trosclair, who received the hammer from Detective Tregre, and who sent the hammer to (and received the hammer from) the Louisiana State Police crime lab. The trial court was persuaded as to the relevance of the hammer both by Detective Tregre's testimony that the hammer was seized from defendant's residence and by Dr. Mackenzie's testimony that an instrument such as the hammer could have delivered the fatal blows to the victim's head.
Defendant asserts that the hammer introduced as State's Exhibit 20 was tan or brown in color, and that it did not match the description *1052 of the murder weapon given by Junius Banks in his June 4, 1993 statement to police[1], but was merely similar. Defendant therefore contends the trial court's admission of the hammer into evidence was unduly inflammatory and prejudicial to his defense.
In State v. Manieri, 378 So.2d 931, 933 (La.1979), the Louisiana Supreme Court held that "[i]t is error to introduce into evidence weapons which are allegedly `similar' to the ones used in the murder. The jurors naturally tend to infer a connection between the weapon and the murder simply from a mere viewing of the material object, although such a connection is not proved." The defendant in Manieri was found guilty of murdering an eleven-year-old boy by stabbing and strangulation. Three knives were among the items admitted as evidence at trial, one of which was found in the kitchen drawer of the victim's residence. None of the knives had blood stains on them, and a State's witness testified that none of the knives was the murder weapon. The Supreme Court held that the trial court erred in admitting the knives, but that it was not reversible error. No effort was made during the trial to connect the knives with the crime, thus little possibility existed that jurors were prejudiced by their admission into evidence. Although it did not find reversible error in the facts of the case before it, the Manieri Court cautioned that "[b]ecause the potential for prejudicial effect may outweigh any probative value such evidence may possess, it is our view that a trial judge flirts with prejudicial error when he permits such evidence to be introduced." Id.
The record in the matter before us offers diverging descriptions of the actual color of the hammer introduced at trial. In argument outside the jury's presence, defense counsel stated that the hammer was not white or yellowish, but brown. On cross-examining Detective Tregre, defense counsel showed him the hammer and asked whether it had a white handle. The detective responded that it was "yellowish or whitish."
Once a proper foundation has been laid with regard to a piece of evidence, a lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than admissibility. State v. Landry, supra at 704; State v. Sharlow, 493 So.2d 213, 218 (La.App. 5th Cir.1986), writ denied, 496 So.2d 329 (La.1986). Because a proper foundation was laid for the admission of the hammer into evidence, any weaknesses in its identification are questions of fact for the jury to determine.
In any event, the case before us is factually distinguishable from Manieri and the trial court did not err by admitting the hammer into evidence. The hammer did not purport to be similar to the one used in the murder, it purported to be the one used in the murder. Moreover, Junius Banks, an eyewitness to the murder, positively identified the hammer as the instrument used by the defendant to kill Varrone Carter. Therefore, the admission of the hammer did not constitute prejudicial error.
For the foregoing reasons, the trial court did not err by admitting State's Exhibit 20 (the carpenter's claw hammer) into evidence at trial. Accordingly, defendant's conviction and sentence are hereby affirmed.
AFFIRMED.
NOTES
[1] In his June 4th statement, Banks described the murder weapon as "a white handle hammer, the handle was white like it had been dipped in paint and some of the paint was peeling of (sic) and it had been worn down a little bit, but it was white."